IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

THOMAS DUNCAN,                                    No. 3:23-CV-00172-HZ

                    Plaintiff,                    OPINION & ORDER

v.

COSTCO WHOLESALE
CORPORATION,

                    Defendant.


Michael R. Fuller
Emily Templeton
OlsenDaines
US Bancorp Tower
111 S.W. Fifth Avenue, Suite 3150
Portland, OR 97204

        Attorneys for Plaintiff

Helen M. McFarland
Heriberto Alvarez, Jr.
Seyfarth Shaw LLP
999 Third Avenue
Suite 4700
Seattle, WA 98104

        Attorneys for Defendant

HERNÁNDEZ, District Judge:

This matter comes before the Court on Defendant's Motion for Summary Judgment, ECF 20. For the reasons that follow, the Court grants Defendant's Motion.

## BACKGROUND

Defendant Costco Wholesale Corporation ("Costco") is membership-only club. Richardson Decl., ECF 21, ¶ 2. In order to become a member and shop in Costco's stores, an individual must pay a membership fee and agree to specific terms and conditions including that "[i]f a member threatens the safety of any employee or other member . . . or engages in other behavior [Defendant] find[s] inappropriate, [Defendant] [may] ask [the individual] to leave [the] property." *Id.* ¶ 5. Defendant occasionally seeks the assistance of law enforcement to remove individuals from Defendant's property. McFarland Decl., ECF 25, Ex. G at p. 29; Ex. H at 52.

In 2021 and 2022 Defendant experienced an increase in "pushouts,"[1] at its Roseburg store. Richardson Decl., ¶ 7. For example, in the week between December 30, 2021 and January 5, 2022, there were three pushouts at that store. Richardson Decl., ¶ 8. In an attempt to reduce the number of pushouts Defendant's General Manager of the Roseburg store, Randy Richardson, implemented a loss prevention action plan in January 2022. As part of the loss prevention action plan, Richardson asked employees to be "observant of merchandise in the areas where potential theft has occurred" and Defendant trained "employees to look for suspicious behavior and provided parameters about when a Costco employee could make a stop" of a customer. *Id.* ¶ 9. In January 2022 Richardson also hired Jeff Willis as a part-time Loss Prevention Specialist. Willis

---

[1] In a typical "pushout," one or more individuals enter the store, select high-priced items, and run out of the store through an emergency exit door without paying. Richardson Decl. ¶ 7. Individuals doing a pushout often have a driver positioned outside of the store to quickly load the merchandise and drive away. Richardson Decl., ¶ 7.

"reviews [Defendant's] security footage, monitors the warehouse floor for any irregular shopping behavior (often in an 'undercover' manner [when he] act[s] as a shopper and blend[s] in with [Defendant's] members . . .), and prepares loss prevention communications." *Id*. ¶ 10.

The Roseburg store had fewer pushouts in 2022, but on November 22, 2022, the store experienced a pushout through an emergency exit door and Defendant was, therefore, "on high alert for pushouts in the days following this incident." Richardson Decl., ¶ 11.

November 25, 2022 Plaintiff entered the Roseburg store at 8:30 a.m., went to the electronics department, and placed "high-price gaming computer equipment and multiple computer monitors" in his cart. *Id.* ¶ 12. Pursuant to the loss prevention action plan, Richardson "took note of the high value items" in Plaintiff's cart. *Id.* Richardson states in his Declaration that Plaintiff "began heading towards one of the emergency exit doors" and as a "precautionary measure," Richardson "went to stand in front of the emergency exit door." *Id.* ¶¶ 13-14. Richardson also instructed employees "to be by the emergency exit doors on both sides of the" store. McFarland Decl., Ex. B (Richardson Depo.) at 127.

At some point before 9:00 a.m. Assistant General Manager Matt Reynolds looked for Richardson and was advised that Richardson was "on the floor watching a suspicious individual." Reynolds Decl., ECF 22, at ¶ 4. Reynolds "started walking down an aisle without knowing who the suspicious individual was" and saw Plaintiff. *Id.* Reynolds states that Plaintiff "started aggressively staring at me, in a threatening manner for approximately six or seven seconds. It was the kind of stare that made me understand he wanted to hurt me. I was so afraid that I almost did not want to walk down the aisle." *Id.* Nevertheless, Reynolds continued down the aisle and greeted Plaintiff. Reynolds states in his Declaration that "Plaintiff's behavior scared [him]" and he "was alarmed by" Plaintiff. *Id.* ¶ 6. Reynolds located Richardson and informed

him of his interaction with Plaintiff. At that point Richardson advised Reynolds that Plaintiff was the person that Richardson had been watching. Richardson then directed Reynolds to stand by an emergency exit in case of a pushout attempt. At some point when Reynolds was standing by the emergency exit door, Plaintiff walked by him while talking on his mobile phone and Reynolds heard Plaintiff say: "Yeah, they have all the doors blocked." *Id.* ¶ 9; McFarland Decl., Ex. D (Reynolds Depo.) at 28.

Willis arrived at the store to begin his shift at 9:00 a.m., and was advised that Richardson was "watching someone in the 'hardlines' area of" the store. Willis Decl., ECF 23, ¶ 3. Willis was not given a description of the individual, but was advised that he had "high-dollar items in his cart." *Id.* Willis located Plaintiff shortly thereafter and observed his shopping behavior. Willis noted Plaintiff "crisscrossed the warehouse from one side to the other and did not select any additional merchandise for a long time. He kept walking by emergency exit doors throughout the warehouse that were staffed by Costco employees." *Id.* ¶ 4. "Based on [Plaintiff's] behavior and [Willis'] experience in watching and preventing pushouts in the warehouse, along with [his] experience as an Oregon State police officer, [Willis] was fairly confident that Plaintiff was planning to push out of an emergency exit door." *Id.* Willis "tried to stay close to [Plaintiff] . . . and monitor[] his movements." *Id.* At approximately 9:21 Plaintiff began following Willis. The video submitted by Plaintiff reflects that Plaintiff moved to the front of his cart and pulled the cart behind him while following Willis at a distance of about five feet. "When [Willis] stopped walking, Plaintiff stopped. When [Willis] continued walking, he kept pursuing [him]." *Id.* ¶ 5. Willis, posing as a customer, asked Richardson about a product and "Plaintiff waited with his cart for [Willis] to finish speaking and then began to" follow Willis again. *Id.* Willis heard Plaintiff speaking to someone on his phone and saying "that because [Willis] had followed

[Plaintiff], he was following [Willis]. Plaintiff loudly stated, 'it was kinda fun' to follow [Willis]." *Id.* ¶ 6. Plaintiff states in his Declaration that he was on his phone with his mother and told her regarding Willis: "If he's going to follow me, I'm going to follow him and see how he likes it." Pl. Decl., ECF 32, ¶ 8. Plaintiff states that he followed Willis "for one or two aisles," but then got bored and continued with his shopping. *Id.* "After several minutes" Plaintiff stopped following Willis and Willis located Richardson and told him that Plaintiff had followed him. Willis Decl. ¶ 7. At 9:30 Plaintiff stopped his cart in front of or close to Willis' cart. Willis states in his Declaration that Plaintiff "strongly addressed [him] and raised his hands up in the air. He said he had observed me looking at him from one of the aisles. He said in a loud and upset manner something to the effect of, 'I'm a member, I have a credit card, and I'm shopping.'" *Id.* ¶ 8. Plaintiff states in his Declaration that "[a]fter I turned yet another corner and . . . Willis was there, I stopped where I was, and laughed and I asked him how much he was getting paid to follow me around. I gestured up and down the aisle. My tone was skeptical . . . but I . . . didn't yell, scream, or raise my voice in any way. I didn't block his path or push my cart in front of his." Pl. Decl. ¶ 10. In the video of the incident, the view of Willis is almost entirely blocked by a large pallet of merchandise. The video reflects Plaintiff stopping in front of or to the side of Willis, facing Willis, and gesturing or pointing with his right hand. Templeton Decl., Ex. 5. Plaintiff's interaction with Willis lasted approximately 30 seconds and then Plaintiff continued past Willis. *Id.* Willis testifies in his Declaration that he believed Plaintiff was "upset" and Willis "wanted to avoid further interaction with" Plaintiff. Willis Decl. ¶ 8. "Plaintiff's behavior made [Willis] uncomfortable." *Id.* Willis then sent a text message to Richardson stating that Plaintiff had "challenged" Willis.

After learning of Plaintiff's encounter with Willis, Richardson became "concerned about Plaintiff's . . . behavior." Richardson Decl. ¶ 19. Richardson spoke with Reynolds about his concern, stated that he believed that Plaintiff had violated Defendant's membership terms "through his interactions with Willis and Reynolds," and noted that "typically" when members "become aggressive," Defendant asks them to leave. Richardson Decl., ¶ 20. Richardson, however, advised Reynolds that he was concerned "that if [Richardson], or any other Costco employee asked Plaintiff to leave, he might engage in physical violence." *Id.* Reynolds advised Richardson that he did not feel safe asking Plaintiff to leave. *Id.*; Reynolds Decl. ¶ 12. Richardson, therefore, "decided to seek assistance from law enforcement in case Plaintiff resisted [the] request to leave or became violent." *Id.* Richardson directed Reynolds to call the Douglas County Sheriff's Office for assistance.

Reynolds called the Douglas County Sheriff's Office nonemergency line at 9:41 a.m. The call lasted approximately two minutes as follows in relevant part:

| | |
|---|---|
| Dispatch: | Okay, how can I help you? |
| Reynolds: | Yea, I have a, I have a gentleman we've been uh -- he challenged my Loss Prevention guy, and uh, we were gonna uh you know uh trespass him, but uh he's kind of scary, so we wanted to call you. |
| Dispatch: | Okay. Umm where is he at now? |
| Reynolds: | Uh he's in my store. (Okay.) And he's just walking around. |
| Dispatch: | So it, what would be, like initially doing that he was approached for, just being like out of hand or? |
| Reynolds: | No, no. He uh basically came in, and uh [inaudible] my Loss Prevention guy. We're all uh -- the guy was just grabbing a bunch of stuff like he was going to go out the exit door and then um -- so we're all just standing in front of the exit doors, and he just approached my uh, my Loss |

> Prevention guy like ugh you know 'what are you doing' and all this stuff. And so, normally I would just say, 'hey don't talk to my people that way.' But uh -- like uh kicked him out. But uh we don't want to do that because he's a big guy and he's kind of aggressive, so I talked to the manager and he wants me to call you guys.

Dispatch:    Alright, and uh, what's he, what's he wearing?

Reynolds:    He's wearing like a big green jacket, he's about 6'3" 6'4". Um it's a hooded green jacket. He's got black tennis shoes with a white sole. Blue jeans. (Okay.) Uh, brown hair, cut real short. Beard, cut short.

Dispatch:    Okay. Alright, we'll send out some help for you okay?

Reynolds:    I appreciate, thanks so much.

Pl. Ex. 1.

At 10:00 a.m. two Douglas County Sheriff's deputies arrived at the store. Reynolds met with the deputies and pointed Plaintiff out to them. Reynolds states in his Declaration that when the deputies contacted Plaintiff and informed him that he had to leave the store, Plaintiff "raised his voice and started arguing with them. He challenged the officers, saying 'you don't have the authority to make me leave,' to which the officers responded that Costco had asked him to leave. Plaintiff said, 'who is Costco?'" Reynolds Decl. ¶ 15. Reynolds "identified [himself] as Costco and [Plaintiff] eventually walked out with" the deputies. *Id.* Reynolds testifies that Plaintiff "continued arguing with the officers" on the way out of the store then "spent some time" with the deputies outside the building. *Id*. Plaintiff states in his Declaration that he was "confused and embarrassed" when the deputies informed him that he had to leave the store. Pl. Depo. ¶ 13. Plaintiff "tried asking [the deputies] why [he] was being asked to leave but they just said [he] was being trespassed, and if he didn't cooperate [he would] be prosecuted." *Id.* Plaintiff states he "never raised his voice or was aggressive or combative with the police officers." *Id.* The

deputies' initial contact and discussion with Plaintiff happens outside the range of the videos produced by Plaintiff. The videos only show Plaintiff walking down an aisle towards the main exit in front of the deputies and talking on his mobile phone.

On December 29, 2022, Plaintiff filed an action in Multnomah County Circuit Court alleging Defendant violated Oregon Revised Statute § 30.845(1) when it called the police on Plaintiff "with improper intent, to infringe on [Plaintiff's] rights under the Oregon or United States Constitutions, or unlawfully discriminate against [Plaintiff], or cause [Plaintiff] to feel harassed, humiliated or embarrassed, or damage [Plaintiff's] reputation or standing within the community, or [Plaintiff's] financial, economic, consumer or business prospects or interests."[2] Compl. ECF 5, Ex. 1, ¶ 8. Plaintiff sought noneconomic damages in the amount of $250,000.

On February 6, 2023, Defendant removed the matter to this Court on the basis of diversity jurisdiction. Also on February 6, 2023, Plaintiff filed a First Amended Complaint in which he alleges the same facts and cause of action, but amends his damages request to include punitive damages "not to exceed 1% of [Defendant's] annual revenue, or $2 billion, whichever amount is smaller." FAC ¶ 4, p. 4.[3]

On August 7, 2023, Defendant filed a Motion for Summary Judgment seeking summary judgment on all of Plaintiff's claims. The Court took Defendant's Motion under advisement on September 18, 2023.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

---

[2] Although Plaintiff did not set out the specific subsections of § 30.845 that Plaintiff alleges Defendant violated, these allegations correspond to § 30.845(1)(a)-(c) and (e).
[3] The FAC paragraphs are misnumbered, after ¶ 6 they begin to repeat at ¶ 3.

moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

### I.    Request for Judicial Notice

Defendant includes a Request for Judicial Notice with its Motion for Summary Judgment. ECF 26. To the extent that the Court relied on the document attached to Defendant's Request, which consists of an excerpt from the Oregon State Legislature website displaying titles and

statutory language in the 2021 edition of Oregon Revised Statutes Chapter 30, Defendant's

request is granted. *See M. K. v. Google LLC,* No. 21-CV-08465-VKD, 2023 WL 4937287, at *3

(N.D. Cal. Aug. 1, 2023)("Courts may take judicial notice of matters of public record, including

statutes, regulations and agency interpretations thereof."); *Khoja v. Orexigen Therapeutics, Inc.*,

899 F.3d 988, 999 (9th Cir. 2018)("[a] court may take judicial notice of matters of public

record.").

## II.    **Motion to Strike**

In its Reply Defendant moves to strike portions of Plaintiff's Response to Defendant's

Motion for Summary Judgment and certain evidence submitted by Plaintiff in support of his

Response as irrelevant and/or inadmissible. The Court grants Defendant's Motion to Strike to the

extent that it disregards the portions of Plaintiff's Response and documents that do not contain

admissible evidence and/or are irrelevant.

## III.    **Plaintiff's Claims for Violation of Or. Rev. Stat. § 30.845(1)(a), (b), and (e)**

In his Response Plaintiff states he "opt[s] to pursue only" the alleged violation of Or.

Rev. Stat. § 30.845(1)(c). The Court, therefore, dismisses Plaintiff's claims for violation of

§ 30.845(1)(a), (b), and (e).

Plaintiff has also withdrawn his claim for punitive damages. The Court, therefore,

dismisses Plaintiff's claim for punitive damages.

## IV.    **Plaintiff's Claim for Violation of Or. Rev. Stat. § 30.845(1)(c)**

Or. Rev. Stat. § 30.845(1)(c) provides: "A person may bring a civil action for damages

against any person who knowingly causes a police officer to arrive at a location to contact

another person with the intent to . . . [c]ause the other person to feel harassed, humiliated or

embarrassed." Defendant moves for summary judgment on the basis that Plaintiff has not

produced any evidence that Defendant summoned the Douglas County Sheriff's Office with the intent to cause Plaintiff to feel harassed, humiliated, or embarrassed. Defendant asserts it called law enforcement because Defendant's personnel were concerned about Plaintiff's behavior and did not feel safe asking him to leave.

Or. Rev. Stat. § 30.845 does not define "intent." In addition, since the Oregon Legislature enacted § 30.845 in 2020 no Oregon court has analyzed the language of its provisions. Plaintiff, relying on *Labor Ready Northwest Inc. v. Bureau of Labor & Industries*, 188 Or. App. 346 (2003), asserts that when "intent" is not defined in a statute, Oregon courts have defined intent as "'the act, fact, or an instance of intending[,]' 'the design or purpose to commit any wrongful . . . act that is the natural and probable consequence of other voluntary acts or conduct[,]' and 'the state of mind or mental attitude with which an act is done. . . .'" *Id.* at 359 (quoting Webster's Third New Int'l Dictionary 1176 (unabridged ed 1993)). The court in *Labor Ready* found the Oregon legislature's used of the phrase "*intentionally failed or refused* to pay the prevailing rate of wage . . . strongly suggests a conscious choice" is required. *Id.* at 360 (emphasis in original).

Defendant does not appear to contest Plaintiff's proposed definition of intent or propose a different meaning based on the plain language of the statute, legislative history, or maxims of statutory construction. Rather, Defendant asserts Plaintiff has not submitted any evidence from which the Court can infer that Defendant summoned law enforcement with the "design or purpose" or the "conscious choice" to make Plaintiff feel harassed, humiliated, or embarrassed.

Plaintiff asserts, and Defendant does not disagree, that evidence of intent is often circumstantial, inferential, and a question of fact. Nevertheless, to survive summary judgment the nonmoving party must come forward with more than "evidence that is 'merely colorable.'" *Wagnon v. Rocklin Unified Sch. Dist.,* No. 2:17-CV-1666-KJN, 2023 WL 4352623, at *5 (E.D.

Cal. July 5, 2023)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Evidence

that "'is not significantly probative[,]'" or that creates nothing more than "'some metaphysical

doubt as to the material facts'" is insufficient to create a material dispute of fact. *Id.* (quoting

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Similarly, a

party's "'conclusory statement [regarding] a genuine issue of material fact, without evidentiary

support'" is insufficient to create a material dispute of fact sufficient to survive summary

judgment. *Id.* (quoting *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1167 (9th Cir. 2002)).

Plaintiff, therefore, must point to sufficient evidence that Defendant called law enforcement with

the "design or purpose" or the "conscious choice" to cause Plaintiff to feel harassed, humiliated

or embarrassed.

Plaintiff relies on deposition testimony by Willis, Richardson, and Reynolds that no one

at Costco witnessed Plaintiff attempt to conceal any merchandize, place merchandise back on the

shelf after it was in his cart, "dump" any merchandise around the store, "pass the last point of

sale without paying," or push out the emergency exit doors. Pl. Resp. at 31-32. Defendant,

however, does not assert it called law enforcement because it was concerned that Plaintiff was

going to steal merchandise. Rather, Defendant asserts it called law enforcement because Costco

personnel had interactions with Plaintiff that made them uncomfortable, and they did not feel

safe asking Plaintiff to leave the store themselves.

Plaintiff contends there is no evidence on the record that "shows anyone actually believed

[Plaintiff] was 'scary' or 'acting aggressive' when . . . Reynolds placed the call to the police." Pl.

Resp. at 32. Plaintiff admits he became annoyed when Willis followed him and that because he

was annoyed, he decided to "toy with" Willis by following him around the store, but Plaintiff

asserts he was not aggressive or scary. Plaintiff alleges the testimony of Willis, Reynolds, and

Richardson that they felt unsafe asking Plaintiff to leave the store is an "attempt to cover up [Defendant's] pretextual justification" for calling law enforcement. Pl. Resp. at 33. Plaintiff relies on Reynolds' deposition testimony that when asked if his interaction with Plaintiff made him fear for his safety, Reynolds responded "That's a little strong. I didn't fear for my safety." Templeton Decl., Ex. 16 at 55. Plaintiff asserts that shortly after Reynolds gave that testimony, he testified as Defendant's 30(b)(6) witness and did "a 180 [and] claim[ed] [Plaintiff's] eye contact was 'threatening', 'menacing' and even goes as far to say that it made him believe [Plaintiff] wanted to 'hurt' him." Pl. Resp. 33 (citing Templeton Decl., Ex. 17 at 14, 26). Plaintiff, however, fails to include Reynolds' full statement during his deposition regarding whether his interaction with Plaintiff made him feel unsafe. The full exchange at deposition is as follows:

> Q:    And did you fear for your safety after your interaction with [Plaintiff]?
>
> A.    That's a little strong. I didn't fear for my safety. I just walked away. Fearing for my safety came later when we approached him.
>
>                                         * * *
>
> Q:    You feared for your safety when the police officers arrived?
>
> A.    When they approached him.
>
> Q:    Okay. But at any point before the police officers did you fear for your safety because of [Plaintiff]?
>
> A.    I feared for [Willis'] safety.

Templeton Decl., Ex. 16 at 55. At the 30(b)(6) deposition Reynolds testified:

> I called the police based on my interactions, [Plaintiff's] aggressive and menacing stare at me earlier and then now he's engaging my loss prevention guy.... The intention was to ask him to leave with the police there in case he got unruly.

* * *

The conversation I had with [Richardson] is "I don't feel comfortable asking him to leave." So he – the earlier when he stared me down it was six to seven seconds long. Deadpan stare. That's a – an eternity. No one does that. So the last thing I wanted to do was walk back up to him and ask him to leave without having a safety net. That was why we called the police, so that we could ask him to leave.

* * *

Calling the police was because we were afraid to ask him to leave. I was. That's why we called the police. But if we weren't afraid, if he wasn't being aggressive, and his behavior was wrong, we might have just asked him to leave.

* * *

We both agreed we should ask him to leave. We hadn't asked him to leave because of the stuff in his basket; we were asking him to leave because of how he did what he did. But in my conversation with [Richardson] didn't – neither one of us felt that it was – it might get out of hand. We felt that he was aggressive already, and our first thing is the safety of our members and employees. Okay. That's the first thing. And we didn't feel that we could guarantee that if we approached him.

McFarland Decl., Ex. D (Costco Depo.), 14, 17, 19, 20. Reynolds' testimony given as

Defendant's 30(b)(6) witness is consistent with his individual deposition testimony and supports

Defendant's assertion that it called law enforcement because employees were uncomfortable

asking Plaintiff to leave.

Plaintiff also relies on the video footage of his interactions with Reynolds and Willis.[4]

This footage, however, does not provide insight into any of Defendant's employees' state of

mind. It reflects that Plaintiff followed Willis around the store for several minutes at a distance

---

[4] Plaintiff repeatedly asserts Defendant "does not want the Court . . . to view the footage of [these] interaction[s]" because they do not support Defendant's argument. *See, e.g.,* Pl. Resp. at 13, 14, 16, 19, 20, 33, 34, 38. Plaintiff produced seven videos of his time in the store and the Court has viewed each of them in deciding Defendant's Motion.

of no more than five feet and that Plaintiff stopped near Willis and had a discussion with him. Although Plaintiff asserts he followed Willis to "toy with him" and that he was not threatening or scary, the footage does not provide evidence from which the Court could infer that Defendant's stated reason for calling law enforcement is pretextual or unsupported.

Plaintiff also asserts either that Defendant called law enforcement because Plaintiff is Hispanic or that Defendant intended to harass, humiliate, or embarrass Plaintiff because he is Hispanic. Richardson and Reynolds testify in their Declarations that they did not know Plaintiff was Hispanic at the time they decided to call law enforcement. *See* Richardson Decl. ¶ 23; Reynolds Decl. ¶ 18. Plaintiff stated at deposition that although he does not speak Spanish Defendant's employees might have known he was Hispanic because he "wear[s] baggier clothes," and because of the "way [he] walk[s]" and "present[s] [himself]." McFarland Decl., Ex. A at 84-85. Plaintiff also testified that Defendant's employees could have known he was Hispanic from the tattoos he has on his arms. *Id.* Plaintiff, however, wore a long-sleeved jacket when he was at the store and, therefore, his tattoos were not visible to Defendant's staff. Even viewing this evidence in the light most favorable to Plaintiff, the Court finds it is insufficient for the Court to infer that Defendant was aware that Plaintiff was Hispanic at the time of the events or to infer that because Plaintiff is Hispanic Defendant called law enforcement with the intent to cause Plaintiff to feel harassed, humiliated, or embarrassed.

Plaintiff testified at deposition that he does not know why Defendant called law enforcement. Plaintiff does not cite any testimony by any individual involved in the decision to call law enforcement that indicates Defendant did so with the intent to cause Plaintiff to feel harassed, humiliated, or embarrassed. In addition, Plaintiff does not point to any text message or communication between Defendant's employees that indicates any intent to harass, humiliate, or

embarrass Plaintiff. The recording of the call to the Douglas County Sheriff's Office also supports Defendant's stated intent in calling law enforcement. As noted, in that call, Reynolds advises the Sheriff's Office that Defendant's employees did not feel safe asking Plaintiff to leave.

The Court concludes that Plaintiff has not presented evidence that is significantly probative and more than "merely colorable" or that creates more than "some metaphysical doubt as to the material facts." *Wagnon*, 2023 WL 4352623, at *5 (quotations omitted). Plaintiff fails to point to evidence from which the Court can reasonably infer that Defendant called law enforcement with the intent to cause Plaintiff to feel harassed, humiliated, or embarrassed or for the Court to infer any basis for Defendant's decision to call law enforcement other than that Reynolds, Richardson, and Willis were concerned about Plaintiff's behavior and Richardson and Reynolds did not feel comfortable asking Plaintiff to leave the store. Plaintiff, therefore, has not established that a genuine dispute of material fact exists as to Defendant's intent in calling law enforcement. Accordingly, the Court grants Defendant's Motion for Summary Judgment.

**CONCLUSION**

The Court GRANTS Defendant's Motion for Summary Judgment, ECF 20.

IT IS SO ORDERED.


DATED:    October 10, 2023    .




MARCO A. HERNÁNDEZ
United States District Judge